**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CESAR PRATTS,** | |
|         Plaintiff-Appellant, | Civil Action No. 13-CV-2372(FLW) |
| **v.** | |
| **COMMISSIONER OF SOCIAL SECURITY,** | **OPINION** |
|         Defendant-Appellee. | |

**WOLFSON, United States District Judge:**

Cesar Pratts ("Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security ("Defendant") denying Plaintiff disability benefits under Title II of the Social Security Act ("SSA"). Plaintiff contends that the decision to deny Plaintiff disability benefits is not supported by substantial evidence. For the reasons expressed herein, the decision of the Acting Commissioner of Social Security is vacated and remanded for further proceedings consistent with this opinion.

**I. Background and Procedural History**

Plaintiff was born on May 30, 1964, and he was 41 years old on the alleged disability onset date of September 9, 2005. Administrative Record 179, 171 (hereinafter "A.R.").  Plaintiff is a high school graduate, and completed some college work. A.R. 41. He is married with three children, with ages ranging from 13 to 23, all of whom live at home. A.R. 62.

Prior to his disability date, Plaintiff worked, first, as a section manager for a fast food restaurant, then as a truck driver, and most recently as a Supply Sergeant in the United States Army. A.R. 172, 78. From 1990–1995, his longest period of employment, Plaintiff worked as a truck driver. A.R. 172. In that capacity, his responsibilities included driving long distances, truck maintenance, and loading and unloading the trucks. A.R. 172. He carried cargo weighing at most 100 lbs., and on average 35 lbs. A.R. 172–73. Additionally, Plaintiff's activities included sitting, reaching, using machines, using technical knowledge and skills, and writing components. A.R. 171. Plaintiff was an Army reservist who was called to active duty and served three years during the Iraq war, from 2005 to 2008. A.R. 38. Several of his disabilities stem from that time period.

According to Plaintiff, since September 28, 2005, he has been unable to work due to the following injuries and illnesses: injuries to his knees and right elbow; diabetes; sleep apnea; blood clots; and post-traumatic stress disorder ("PTSD"). A.R. 171. Plaintiff has stated that these conditions limit his ability to work for several reasons. First, Plaintiff was prevented from obtaining a commercial driver's license due to the Department of Transportation's regulations surrounding diabetes. *Id.* Second, Plaintiff avers that he cannot lift anything over 30 pounds, he cannot walk, he gets headaches and dizziness, and finally that he has a "green field filter" to filter clots in his vein. *Id.* In connection to these conditions, Plaintiff takes medication for diabetes, high blood pressure, pain relief, blood thinning, stomach problems, erectile dysfunction, high cholesterol, and chest pains. A.R. 175–76.

Plaintiff applied for Social Security Disability Insurance Benefits ("SSDIB") on July 9, 2008; the claim was denied on December 2, 2008, and again upon reconsideration on June 30, 2009. A.R. 93, 98. On July 2, 2009, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). A.R. 103. A hearing was held on October 18, 2010, before ALJ Donna Krappa.

A.R. 51. Plaintiff, who was represented by Donald M. Stanzione at the hearing, appeared and testified, and testimony was taken from a vocational expert. A.R. 51–90. On January 24, 2011, the ALJ issued a decision finding that Plaintiff was not disabled. A.R. 46. Plaintiff requested review by the Appeals Council, which denied review on September 12, 2012. A.R. 1. Then, on April 12, 2013, Plaintiff filed the present appeal against the Acting Commissioner of Social Security.

### a.  *Review of the Medical Evidence*

As an initial matter, I note that the Administrative Record in this case is approximately 2500 pages long, and includes thousands of pages of medical records[1], dating back to 2005. Accordingly, I shall only discuss the issues and records that are relevant to this appeal. Likewise, while Plaintiff's medical history indicates a legion of health problems, including thrombophlebitis, patellofemoral syndrome, joint pain, later epicondylitis (tennis elbow), penis edema, gastrointestinal bleeding, diabetes, venous thrombosis, hypertension, abdominal pain, chest pain, sleep apnea, etc., *see* A.R. 323, I will discuss only the medical problems that were raised in the Social Security application, the ALJ's decision, and the briefs to this Court.[2]

I note that the Department of Veterans Affairs ("V.A."), which has been largely responsible for Plaintiff's medical treatment, has issued several decisions regarding Plaintiff's disabilities. Several of these decisions include detailed information regarding Plaintiff's

---

[1] I note, however, that a certain amount of these documents appear to be duplicates.

[2] For example, on November 11, 2006 Plaintiff was hospitalized following emergent bilateral pulmonary emboli. A.R. 704. His primary care physician concluded that Plaintiff "will likely need indefinite anticoagulation since this is his second episode of pulmonary artery thrombosis." A.R. 708. However, the ALJ did not include this or any of Plaintiff's other physical medical issues in her opinion. Moreover, Plaintiff has not raised these medical problems in his briefs, save to point out their existence in the record. *See* Pl. Br. at 8. Accordingly, I shall not discuss them further.

impairments, based on his medical records and physical examinations. The first decision, dated January 16, 2009, did not provide a total disability rating, but examined many of Plaintiff's impairments. *See* A.R. 1647–1668. A second decision, dated March 3, 2009, assigned Plaintiff a disability rating of 90%. A.R. 736. Finally, Plaintiff received a 100% disability rating from the V.A.; the date on the letter is unclear. A.R. 221–222. These decision indicate that the V.A. considered Plaintiff disabled based on PTSD, lumbar strain, diabetes, metarsalgia on both feet, warts, headaches, sleep apnea, patellofemoral syndrome in both knees, and penile venous thrombosis. A.R. 1648, 222.

### 1. Plaintiff's Physical Impairments

Plaintiff's health records begin in 2005 after he returned from deployment and began treatment at the Womack Army Medical Center (WAMC). As already noted, the record shows that Plaintiff suffers from a multitude of physical impairments. However, several of Plaintiff's relevant medical impairments do not appear to have caused him any serious problems. For example, Plaintiff was diagnosed with diabetes in 2006. A.R. 506, 465. However, his medical records do not show any complications resulting from this illness. *See, e.g.*, A.R. 1912 (2008 record stating "no mention of complication" and "not stated as uncontrolled."); A.R. 1658. Similarly, Plaintiff's hypertension is controlled by medication, and a stress test performed in 2008 did not show ischemic cardiac disease. A.R. 1662. Plaintiff also suffers from gastroesophageal reflux disease ("GERD"), also known as acid reflux, which began in 2005, and is "a chronic problem," but this impairment does not seem to have had any real impact on his ability to work. A.R. 1661.

Several of Plaintiff's impairments have impacted his life more seriously. For example, Plaintiff's penile thrombosis began in approximately September 2005, when he noticed a small

4

lump underneath his pubic bone; upon being given an anti-inflammatory drug, he became ill, had increased pain, and noticed that the dorsal side of his penis had become swollen. A.R. 558. Plaintiff was initially treated with Lovenox, but was later switched to ASA (aspirin), Motrin, and Percocet. *Id.* In October 2005, Plaintiff met with a urology specialist, who indicated that no surgical intervention was required at the time for the thrombosis and recommended Plaintiff continue aspirin treatment and be evaluated for hypercoagulable state and deep vein thrombosis. A.R. 557. In April 2006, following a recurrence of the penile thrombosis, Plaintiff was referred to Dr. Edmond Paquette, a urology specialist. A.R. 442. Dr. Paquette noted abnormal diffuse swelling of entire penis, as well as a tender cord structure at dorsum and base of penis. A.R. 446. Dr. Paquette concluded that the penile edema is most likely idiopathic but expressed concern that there might be an infectious origin. A.R. 451. In 2008, Plaintiff developed thrombosed veins around the foreskin of the penis; this was treated with circumcision. A.R. 1663. Plaintiff testified that he still suffers from the thrombosis periodically; however, the record does not show that he sought further treatment. A.R. 79.

Plaintiff complains of joint pain in his knees; these complaints have occurred since at least January 2006. A.R. 547. Indeed, while in the Army, Plaintiff fell and injured both knees; the precise date of the injury is unknown. A.R. 1665. However, Plaintiff appears to have first been treated for knee pain in the summer of 2008. A.R. 744-751. Imaging done on both knees on July 20, 2008, revealed nothing unusual in the knees. *Id.* Nonetheless, Plaintiff began physical therapy, including stretching, strengthening, resistive exercises, and posture training. A.R. 752. In 2009, Plaintiff indicated that wearing infrapatellar straps and physical therapy helped with the pain. A.R. 1685. According to the January 16, 2009 V.A. disability decision, a physical examination of Plaintiff demonstrated tenderness to palpation in both knees, and a range of

motion from 0-125 degrees, with pain at the end of the range of motion. A.R. 1665–66. Plaintiff complained that the pain was constant, but aggravated by walking, negotiating stairs, and bending. *Id.* Imaging conducted in April 2010 showed small suprapatella joint effusion, and small osteophytes in the knees. A.R. 1961–1962. On multiple occasions, Plaintiff has been treated for his knee pain by aspiration of fluid from both knees, followed by the injection of Euflexxa. A.R. 2261–62, 2393.

Next, Plaintiff has lateral epicondylitis (tennis elbow) in his right arm; he was first diagnosed while serving in Iraq. A.R. 658. On December 8, 2005, Plaintiff began occupational therapy for pain in his right elbow. A.R. 549. Plaintiff did additional therapy for his elbow in the summer of 2008, which consisted of a brace to the right forearm, application of ice and heat, stretching, and strengthening exercises. A.R. 752. The January 16, 2009 V.A. disability decision indicates that Plaintiff's elbow pain was a 3 out of 10, and that there was some tenderness to palpation. A.R. 1664. The right elbow range of motion was 0-135 degrees, with mild pain associated with the end of the range. *Id.* However, at an appointment on February 12, 2009, Plaintiff indicated that his elbow had "not been bothering him at all." A.R. 1685.

Plaintiff has also complained of chronic back pain. Imaging conducted on the lumbosacral spine on July 20, 2008 revealed nothing unusual. A.R. 851. The V.A. disability rating decision stated that a physical examination revealed no gross deformity or tenderness to palpation; however, the range of motion was limited, with pain at the end of the range. A.R. 1657. The V.A. diagnosis was lumbar strain. *Id.* An MRI conducted on August 6, 2009, showed "mild disc desiccation at L4/5 associated with disc bulge," as well as "lateralized disc bulge at L3/4" and "broad circumferential disc bulge" at L4/5. A.R. 1967. The same imaging showed a "right paracentral protrusion at L5/S1" and well as "mild to moderate facet and ligamentum

6

flavum hyptertrophy." *Id.* However, there was no stenosis. *Id.* The imaging did not result in any

diagnosis. *Id.*

Plaintiff sought treatment for sleep apnea at the Womack ear nose and throat clinic in

October 2006. A.R. 323. Plaintiff indicated that he was tired, his pain was controlled by

medicine, that he experienced headaches, and that he exhibited no psychological symptoms. A.R.

325. The treating physician suspected Plaintiff would need a CPAP, and scheduled a sleep study.

A.R. 325. The sleep study found that Plaintiff had severe sleep apnea syndrome. A.R. 33. A

CPAP was prescribed in response. Plaintiff has continued using the CPAP since that time. A.R.

742.

Plaintiff also suffers from chronic headaches. Plaintiff's headaches were evaluated on

July 21, 2008 by Dr. Christopher Terrence. A.R. 785–88. Dr. Terrence noted that the headaches

began immediately following an IED explosion next to Plaintiff's Humvee in Iraq. *Id.* Dr.

Terrence indicated that while Plaintiff's headaches occurred four to five times weekly, they were

not disabling. *Id.* Additionally, Plaintiff tested normal in both the motor and sensory exams. *Id.*

According to the January 16, 2009 V.A. disability decision, Plaintiff's headaches continued to

occur, but were not disabling. A.R. 1659.

### 2. Mental Health

Plaintiff has been diagnosed with PTSD; he was first diagnosed on June 5, 2008. A.R.

840. Plaintiff was evaluated again for PTSD on June 9 of the same year, at which time the

examining doctor noted Plaintiff was depressed and anxious; however, a depression screening

conducted the same day was negative. A.R. 840–41. On June 24, 2008, Plaintiff attended a

"mental health consult" with Dr. Tina M. Roemersma, a psychologist. A.R. 822. Dr. Roemersma

noted that Plaintiff reported not feeling "the same," an inability to remain asleep, and anger

management problems. A.R. 821. Dr. Roemersma also noted that Plaintiff's "[t]hought process appeared logical and coherent" and that he did "not display any signs of a formal thought disorder." *Id.* She prescribed individual psychotherapy sessions every two to three weeks. A.R. 822. At a follow up visit on July 14, 2008 Dr. Roemersma indicated that Plaintiff noticed increased anxiety, road rage, problems sleeping, and difficulty managing his irritability. A.R. 801. Additionally, Plaintiff conveyed he felt useless because he was unemployed. *Id.* As a result, Dr. Roemersma recommended Plaintiff continue individual therapy. *Id.*

The V.A. disability rating decision, dated January 16, 2009, found that Plaintiff "experienc[es] recurring and intrusive thoughts, as well as recurring and distressing dreams." A.R. 1656. He "relives the event via flashbacks and vivid memories" and "avoids thoughts, feelings and conversations associated with [his] experiences." *Id.* The report described Plaintiff as "detached and estranged from others," and had symptoms including "difficulty falling and staying asleep," "irritability with outbursts of anger," and "hypervigilant and exhibit[ing] and exaggerated startle response." A.R. 1656–57.

Plaintiff has continued to obtain psychiatric care through the V.A. At one follow up psychiatric visit on August 3, 2009, the doctor indicated that Plaintiff's "speech [was] organized," but his "[m]ood is depressed and affect is constricted." A.R. 2471. At another follow up, on June 17, 2010, Plaintiff was described as "stable with episodic sleep disturbances and nightmares." A.R. 2382.

### 3. State Agency Examiners

As part of the SSDIB application process, Plaintiff met with several state agency medical examiners.

Dr. Jack Baharlias, Ed. D., conducted a medical status interview with Plaintiff on November 6, 2008. A.R. 998. Dr. Baharlias noted that Plaintiff answered all questions correctly in his cognitive screening test, could count backward, recite the alphabet, and do three-step mathematical activity; Dr. Baharlias concluded that "I do not see any problem with concentration or cognitive abilities." A.R. 999. However, Dr. Baharlias noted that Plaintiff's "thought content was somewhat paranoid"; Plaintiff acknowledged suicidal ideation, but had "no attempts" due to his religious convictions. A.R. 999–1000. Plaintiff indicated to Dr. Baharlias that he "engages in arguments easily." A.R. 1000. Dr. Baharlias found that Plaintiff's "thinking is essentially logical" and stated "I do not believe he has any thought disorder." *Id.* Dr. Baharlias diagnosed Plaintiff with PTSD, depressive disorder, anxiety disorder, and "bilateral knee injuries and other wartime injuries." A.R. 1000–01.

Marc Weber, M.D., conducted a consultative physical exam on November 10, 2008. A.R. 1004. In the physical examination, he noted that Plaintiff had "tenderness upon palpation of the right lateral epicondyle" and that Plaintiff "complains of pain with resisted right elbow pronation." A.R. 1005. With respect to the knees, Dr. Weber found "tenderness of the patellar tendons bilaterally" and "crepitus with range of motion to both knees." *Id.* Dr. Weber stated that Plaintiff could "fully extend his hands, make fists, and oppose fingers," as well as "separate papers, . . . lift a pin off the table, place it in the contralateral hand, and put it back down on the table." *Id.* Plaintiff could "stand on his heels and his toes" but could not perform a squat.

Finally, Dr. Amy Brams, PhD., conducted a psychiatric review on November 24, 2008. Dr. Brams noted that Plaintiff showed signs of a depressive disorder, and an anxiety disorder. A.R. 1622, 1624. Dr. Brams found that Plaintiff had mild restriction of activities of daily living, moderate restrictions in maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence, or pace. A.R. 1629. Explaining her assessment of Plaintiff's functional capacity, Dr. Brams stated that Plaintiff "still has some symptoms of PTSD and depression," but found that "cognitive function, memory and concentration are all adequate. Claimant is able to follow simple instructions, attend and concentrate, keep adequate pace and persist, relate and adapt to routine tasks in a work situation." A.R. 1635.

### b. *Review of Testimonial Record*

#### 1. Plaintiff's Testimony

At the hearing before the ALJ, Plaintiff's attorney confirmed that the following impairments were at issue: PTSD, lower-back pain, diabetes, a headache disorder, podiatric issues, Gastroesophageal Reflux Disease (GERD), acid reflux disease, hypertension, erectile dysfunction, penile venous thrombosis, deep venous thrombosis, pain in his right elbow, pain in his left and right knees, sleep apnea, hyperlipidemia, and high or low cholesterol. A.R. 59 – 61.

Plaintiff then testified. Plaintiff indicated that his wife is a home health-aide, and that his three children, ages 23, 20, and 13, are all students who reside with Plaintiff in South Plainfield. A.R. 62. Plaintiff stated that, although he was driven by his son to the hearing, he is able to drive himself to the supermarket once a week. A.R. 63.

Plaintiff then testified as to his educational and employment experience. Plaintiff stated that he graduated from high school and had two years of training as a computer programmer. A.R. 63. Plaintiff explained that he had been in the military for 26 years, first on active duty and then as a reservist starting in 1990. A.R. 63–64. Plaintiff stated that, while in the Army Reserve, he was also employed by Price Club, then Touchdown Foods, followed by McDonalds. A.R. 64. Thereafter, Plaintiff explained that he was self-employed as a truck driver, and did work for various companies. 64–65. In 2005, Plaintiff was called to active duty and was deployed on April

18, 2005. A.R. 65. Plaintiff said he has a service treatment record from April 18, 2005 through May 2, 2008 for this deployment period.

Plaintiff testified that he feels he can no longer work because he "is stressed out and tired." A.R. 66. Specifically, Plaintiff stated that, "I feel useless really, and I just can't stand people around me, bossing me around, and just telling me what do anymore." *Id.* Plaintiff explained that he is being treated for these feelings by Dr. Soto, a psychiatrist. The ALJ then questioned Plaintiff on to his use of a cane. *Id.* Plaintiff testified that the cane was prescribed because of the damage to his knees, which causes pain and weakness. A.R. 66-67. Plaintiff testified that his knee damage was not treated with surgery, but instead the doctors "took out fluid and they're injecting me with some other fluid."[3] A.R. 67.

The ALJ then inquired as to the other physical conditions that prevented Plaintiff from working. *Id.* Plaintiff first testified as to his back pain, which was treated by stretching exercises. A.R. 67–68. Second, Plaintiff described his elbow pain, which presented as stiffening and weakness. A.R. 68. The elbow pain was treated by "a machine," but Plaintiff did not have surgery or injections. A.R. 68. Thereafter, Plaintiff indicated he had no other severe physical conditions preventing him from working. *Id.*

The ALJ next questioned Plaintiff as to his physical capabilities. Plaintiff testified that he could not walk the length of a block because he would have difficulty breathing. A.R. 69. Plaintiff testified that he was not sure of the exact cause, but presented his blood filter and sleep apnea as potential causes for his difficulty breathing. A.R. 69. Plaintiff also indicated that the use of a CPAP machine has improved his sleep apnea. *Id.*

---

[3] Plaintiff was referring to the aspiration of fluid from his knee and the injection of Euflexxa. *See supra*; A.R. 2261–62, 2393.

11

The ALJ then inquired as to Plaintiff's ability to stand. A.R. 70. Plaintiff testified that he cannot stand for even short periods of time without back and knee pain. *Id.* However, Plaintiff stated that he had not received an MRI for his back. A.R. 70. Plaintiff next described his difficulty sitting, stating that he cannot continually sit for even a short time period. A.R. 71. Plaintiff attributed this difficulty to restlessness and back pain. *Id.* Thereafter Plaintiff testified to his capability to lift things. Plaintiff stated that he could lift a gallon of milk with his left hand, but that he was not sure that he could lift anything weighing ten pounds because he has avoided physical exertion altogether. A.R. 71–72. Plaintiff then testified that he does not experience problems showering or dressing, but does have problems sleeping. A.R. 72–73. Indeed, Plaintiff explained that even with the CPAP machine, he only sleeps two to three hours. A.R. 73.

Plaintiff testified that his "typical day" begins at six or seven o'clock. A.R 73. At that time, Plaintiff stated that he would get up with his wife and have breakfast, and then Plaintiff's wife and youngest child would leave for the day. *Id.* Next, Plaintiff said he would do laundry or do the dishes. A.R. 74. However, Plaintiff testified that he does not vacuum, cook, or do lawn work. *Id.* Plaintiff also stated that he avoids the news, and does "basically nothing" during the day and "just stare[s] at the wall sometimes." A.R. 75. Plaintiff indicated that he does go to the grocery store. *Id.*

Plaintiff's attorney then questioned Plaintiff about his experience in Iraq. A.R. 76. Plaintiff testified that in Iraq he experienced explosions that affected children, and that put himself in danger. *Id.* Plaintiff explained that, due to these experiences, he is insecure around people, and is "always checking out my house making sure everything is locked up and well secured." *Id.* Plaintiff testified that he also avoids people and the news. A.R. 77 Plaintiff then

12

stated that he has constant headaches, two to three times daily, lasting about five minutes each. *Id*.

Thereafter, Plaintiff's attorney questioned him regarding his relationships with his family. A.R. 78. Plaintiff explained that these relationships have diminished because Plaintiff often either yells at his family, orders them around, or does not speak to them. *Id.* Plaintiff testified that their relationships were "not always like that." *Id.*

The ALJ asked additional questions of Plaintiff about his military record. *Id.* In response Plaintiff testified that he was a Staff Sergeant, a Supply Sergeant, and that he was honorably discharged. *Id.* Plaintiff then testified about his attempts to regain employment as a truck driver following his honorable discharge. In that regard, Plaintiff explained that "the noise of the trucks reminded me a lot of Iraq." A.R. 78. In addition, Plaintiff could not qualify for a Commercial Driver's License due to his diabetes. *Id.*

Next, under questioning from his attorney, Plaintiff described how he came to have penile thrombosis. Plaintiff testified that while deployed, there was an explosion that caused many boxes to fall onto him which shut down a penile vein. A.R. 79. Consequentially, Plaintiff experienced swelling, which continues to reoccur once or twice a month and lasts two to three days. *Id.* Plaintiff explained that he treats this swelling with an aspirin regime to thin his blood. *Id.*

Plaintiff's attorney inquired as to whether Plaintiff had ever been hospitalized. Plaintiff responded that he had been hospitalized for chest pains, which, he was told, were the result of stress. *Id.* Plaintiff next recounted his medications: metformin and losartan for diabetes, aspirin for swelling, Atenolol for hypertension, trazodone and citalopram for depression, gabapentin for nerve pain, and medications for acid reflux, cholesterol, allergies, and dry eyes. A.R. 80-82.

Finally, Plaintiff was asked whether he enjoyed working before his conditions evolved. Plaintiff responded "I enjoyed my trucking." A.R. 82. When asked whether he had aspirations of working again, Plaintiff answered, "If I could get through all this stuff." A.R. 82

## 2. Testimony of Mr. Meola

Mr. Rocco Meola, an impartial vocational expert, also testified. First, Mr. Meola evaluated Plaintiff's past work experience. He testified that Plaintiff's past work as a truck driver would be classified as medium to heavy work and semiskilled. A.R. 84. Mr. Meola then stated Plaintiff's work as a Staff Sergeant would also be classified as medium and semiskilled. *Id.* Finally, Mr. Meola classified Plaintiff's work as a section manager in the fast-food industry as light to medium and semiskilled. *Id.*

Next the ALJ outlined the following residual functional capacity: someone with Plaintiff's age, educational background, and work history, with medium physical capacity, meaning he could perform the following physical tasks:

> "[lift] 50 pounds occasionally . . . 25 pounds frequently; stand or walk for six hours; sit for six hours; perform unlimited pushing and pulling with no weight restriction [given by the Judge]; cannot climb ladders, ropes, or scaffolds; but can occasionally use ramps or stairs; can frequently balance and stoop, but only occasionally kneel and crouch; . . . no crawling, . . . no exposure to unprotected heights, hazards, or dangerous machinery; can perform jobs that are unskilled and repetitive that require at least three breaks during the workday each of at least 15 minutes' duration; the jobs must require only an occasional change in work setting during the workday; no work in close proximity to others—that's closer than three to five feet to avoid distraction; and can only have occasional contact with superiors, coworkers, and the general public."

[A.R. 84.]

The ALJ asked Mr. Meola if this person could perform any of the work that Plaintiff had previously performed. A.R. 85. Mr. Meola responded negatively, based on the skill level of the

previous jobs. *Id.* However, Mr. Meola testified that there were jobs that this individual could perform, such as "packager, floor waxer, stapling machine operator, box maker, and cleaner." A.R. 85. Mr. Meola further testified that these jobs existed in numbers of approximately 1,200 in the northern and central region of New Jersey and in excess of 35,000 jobs nationwide. *Id.* When the ALJ probed as to whether the person could perform these jobs and have no contact with the general public, Mr. Meola stated that he could. *Id.* The next question posed by the ALJ was what jobs existed if the person could only engage in "light work," with otherwise similar restrictions. A.R. 86. Mr. Meola testified that examples of light work jobs were inspector/packager, microfilm processor, decal applier, a marker tag machine operator, and cleaner/polisher. A.R 86. Mr. Meola explained those jobs existed in slightly higher numbers – 1,500 in the immediate region and 45,000 nationwide. *Id.*

The ALJ asked Mr. Meola whether there were any jobs where an employee could be totally isolated from coworkers and supervisors; he responded in the negative. *Id.* Then Mr. Meola was questioned if the inability to concentrate for more than six hours would affect an individual's ability to work in the regional or national economy. A.R. 86-87. He answered that someone with such a limitation could not be competitive. A.R. 87. Mr. Meola additionally explained that if an individual were to be absent from work twice a month, he could not be competitive in the national or regional labor market for unskilled workers. A.R. 89. The ALJ then concluded the hearing. A.R. 89.

### c.  *ALJ's Findings*

The ALJ issued a written decision on January 24, 2011. The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act to remain insured through December 31, 2012. A.R 38. Next, the ALJ applied the standard five-step process to determine if

15

Plaintiff had satisfied her burden of establishing disability. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 28, 2005, the alleged onset date. *Id.* Second, the ALJ found that Plaintiff had the following severe impairments: "a disorder of the back; diabetes; headaches; GERD; hypertension; PTSD; disorder of the knees and right elbow; penile thrombosis; and sleep apnea." *Id.*

Third, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the Social Security Act ("SSA") that would qualify for disability benefits. *Id.* In this step, the ALJ paid "particular attention" to the dysfunction of Plaintiff's joints. *Id.* However, the ALJ determined that Plaintiff does not have the necessary degree of difficulty in performing fine and gross movements, or the degree of difficulty in ambulating that is required. A.R. 39. The ALJ also found that the medical evidence did not establish any of the requirements for a listed impairment for spinal disorders, nor for diabetes. Additionally, the ALJ determined that Plaintiff's mental impairment did not satisfy "paragraph B" criteria because Pratts has only mild restriction of daily living, moderate difficulty in social functioning, moderate difficultly with concentration, persistence or pace; and no episodes of decompensation. A.R. 39-40.

Fourth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform the exertional demands of light work as defined in 20 CFR 404.1567(b). A.R. 40. Specifically the ALJ concluded that Plaintiff can: "lift/carry 20 lbs. occasionally and 10 lbs. frequently; stand/walk for 6 hours in an eight hour work day; sit for 6 hours in an eight hour work day; and engage in unlimited pushing and pulling" within the "light" weight restriction. The ALJ also found that Plaintiff can only perform jobs that do not require use of ladders, ropes, or scaffolds, and that Plaintiff may perform jobs that only occasionally require the use of ramps

or stairs. *Id.* Additionally, the ALJ stated that Plaintiff can frequently balance, stoop, and crawl, but that he may only occasionally kneel or crouch. As to his mental capabilities, the ALJ determined that Plaintiff can only preform jobs that are simple, unskilled, and repetitive. *Id.* The ALJ found that Plaintiff requires three breaks a day, lasting at least fifteen minutes each, and is capable of only occasional contact with supervisors, coworkers, or the general public. *Id.*

The ALJ reiterated some of Plaintiff's testimony. A.R. 41–42. The ALJ then concluded that, after considering the evidence, Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his impairment's] symptoms are not credible" to the extent that they are not consistent with RFC. A.R. 42. Specifically the ALJ indicated that the following medical evidence did not align with Plaintiff's statements about his impairments. First, the imaging of Plaintiff's knees, right elbow, and lumbar spine were unremarkable and within normal limits. A.R. 42. Indeed, at a follow-up examination, Plaintiff reported to his doctor that his elbow did not bother him at all. A.R. 42–43. Plaintiff's hypertension is controlled with medications, and his sleep apnea is treated with a CPAP machine; cardiac and pulmonary medical imaging showed normal limits. A.R. 42. Plaintiff's diabetes has not resulted in any hospitalizations or neuropathy. A.R. 42. The ALJ found that this evidence "fails to support [Plaintiff's] assertions of total disability," and that the evidence shows that Plaintiff retains the ability to perform many basic activities associated with work. A.R. 43.

In reaching this conclusion, the ALJ accorded "great weight" to the state agency physicians, Dr. Weber and Dr. Brams. Dr. Weber determined there was no swelling, instability or atrophy associated with Plaintiff's knee or elbow pain. A.R. 43. In that connection, Plaintiff was able to do a series of physical activities, indicating he is capable of significant work-related activities. A.R. 43-44. With regard to Plaintiff's mental impairment, Dr. Bram, the state agency

psychiatric consultant, found that Plaintiff's cognitive function, memory, and concentration all were adequate.  Furthermore, Dr. Brams determined that Plaintiff has the mental capacity to "follow simple instructions, attend and concentrate, keep adequate pace and persist, and relate and adapt to routine tasks in a work situation." A.R. 44. The ALJ concluded that these medical findings were consistent the objective records and support the finding that Plaintiff is capable of significant work-related activities. *Id.*

The ALJ also noted that:

> As to opinion evidence, the record does contain assessments from treating physicians with the Department of Veterans' Affairs ("VA"). While I have considered objective medical evidence in the V.A. records, the determination by the Department of Veterans Affairs the that claimant is partially disabled is not given significant weight as the  standard for disability is different under the Social Security Act.

[A.R. 44.]

Fifth, the ALJ found that, based on Mr. Meola's testimony, Plaintiff is unable to perform any past relevant work. *Id.* However, the ALJ determined that, given Plaintiff's "age, educational, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform." A.R. 45. The ALJ found that Plaintiff did not have the RFC to perform the full range of light work, but that the vocational expert's testimony showed a "significant number" of jobs in the national economy. *Id.* Accordingly, the ALJ concluded that Plaintiff had not been under a disability, as defined by the SSA from September 28, 2005, though January 24, 2011. A.R. 46.

### d. Report of Dr. Paul Fulford

On April 12, 2013, Plaintiff filed a Complaint in this Court, appealing the ALJ's decision. On March 21, 2014, this Court entered an Order allowing a stay of the filing of Plaintiff's brief

to permit Plaintiff to complete a neuropsychology evaluation. This evaluation was conducted by Dr. Paul Fulford, Ph.D., P.A., on April 1 and April 8, 2014. Dr. Fulford's report was completed on May 5, 2014, and filed with the Court in September 2014. See Pl. Ex. F (hereinafter "Fulford Rep.").

In the report, Dr. Fulford first reviewed Plaintiff's background information, including his disability rating with the V.A. Fulford Rep. at 1–2. Dr. Fulford then described the mental status evaluation he conducted. According to Dr. Fulford, Plaintiff was "oriented to month and year but could not recall the date"; he had good "personal and current information," "mental control," and "concentration." *Id.* at 2. Plaintiff reported auditory and visual hallucinations, but denied having "command hallucinations." *Id.* Nonetheless, Dr. Fulford found that Plaintiff's "[j]udgment appeared fair." *Id.* On a self-administered screening instrument for clinical depress, Plaintiff "scored in the significant range for depression." *Id.* at 3. Dr. Fulford then briefly reviewed the findings of Dr. Baharlias. *Id.*

Dr. Fulford then found that Plaintiff "meets the Social Security criteria for affective disorder under the listing of 12.04." *Id.* Dr. Fulford stated that, [u]nder depressive syndrome, he appears to have an appetite disturbance with change in weight (B), (c) sleep apnea, (E) decreased energy and (G) difficulty concentrating or thinking." *Id.* Looking at the (B) criteria, Dr. Fulford found that Plaintiff "is cited in the record as having a GAF[4] of 40" and that he has "mild impairment in maintaining concentration, persistence or pace, and one or two episodes of decompensation." *Id.* Dr. Fulford also commented on "possible (C) critera," finding that Plaintiff has "a current history of one or more years of inability to function outside his highly supportive living arrangement with an indication of continued need for such an arrangement." *Id.* Dr.

---

[4] Global Assessment Functioning score.

Fulford therefore concluded that Plaintiff "is significantly disabled from a mental and physical point of view." *Id.*

## II. Standard of Review

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

**Standard of Entitlement to Benefits**

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* § 1382c (a)(3)(A)–(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. See 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n. 5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling,

reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the

national economy." *Bowen*, 482 U.S. at 146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

### III. Plaintiff's Claims on Appeal

Plaintiff makes five arguments on appeal. First, Plaintiff argues that the ALJ did not correctly attribute weight to the medical opinions of Plaintiff's treating physicians at the V.A. Second, Plaintiff claims that the ALJ improperly evaluated the evidence of the state examiners, Dr. Weber, Dr. Bram, and Dr. Baharlias. Third, Plaintiff contends that the psychological evaluation by Dr. Paul Fulford should be considered as evidence. Fourth, Plaintiff asserts that the ALJ did not properly evaluate Plaintiff's pain and subjective complaints. Finally, Plaintiff argues that the ALJ did not consider the combined effects of Plaintiff's impairments. I shall address each claim in turn.

#### a. Opinions of V.A. Physicians

Plaintiff argues that the ALJ "failed to specifically state how much weight she gave to [Plaintiff]'s treating physicians." Pl. Br. at 7. Indeed, Plaintiff asserts that the ALJ unreasonably discounted "records consisting of nearly a thousand pages." *Id.* Moreover, Plaintiff notes that that the V.A. found that Plaintiff was first 90%, and then 100% disabled, and that this determination is entitled to substantial weight. *Id.*; Pl. Repl. at 2.

Defendant, however, asserts that the assessments of Plaintiff's treating physicians "are not actually medical opinions" but "consist solely of conclusory statements regarding Plaintiff

being disabled or partially disabled." Def. Opp. at 6. In contrast, Defendant argues that "a medical opinion is expressed in functional terms, meaning the Plaintiff's capacity to engage in work-related activities." *Id.* Defendant contends that Plaintiff "has not identified a single medical opinion . . . from a treating source that contradicts the ALJ's RFC determination." *Id.*

In title 20 of the Code of Federal Regulations, section 404.1527(a)(2) defines "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Under 20 C.F.R. § 404.1527(c)(2), a treating physician's opinion will be given controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." Additional factors to be used to determine the weight given to a medical opinion include, <u>inter alia</u>: length of treatment relationship, the nature and extent of the treatment relationship, supportability by medical evidence, and consistency with the record as a whole. <u>Id.</u> If a treating physician's opinion conflicts with that of a non-treating physician, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reasons." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). That is, the ALJ must rely only on "contradictory medical evidence" in rejecting the treating physician's opinion, rather than "credibility judgments, speculation or lay opinion." <u>Id.</u>

Initially, Defendant's definition of a medical opinion—that it is only "expressed in functional terms"—is contradicted by the regulation. A medical opinion is a "judgment about the nature and severity" of an impairment; this definition is not limited to functional terminology. 20 C.F.R. § 404.1527(a)(2). Nonetheless, to the extent that Plaintiff complains that the ALJ failed to

assign weight to opinions in the V.A. medical records, I find that the ALJ was not required to do so. My review of the evidence does not reveal that Plaintiff's treating physicians expressed any judgments on the nature or severity of Plaintiff's impairments. The records do show lists of symptoms and diagnoses. For example, a record of one of Plaintiff's psychological visits, dated December 7, 2009, states that Plaintiff "reported continuous PTSD symptoms with anxiety," and describes Plaintiff's appearance and affect on the date of the visit. A.R. 2439. The ALJ's opinion shows consideration of such evidence. *See* A.R. 38. However, "a medical source's recitation of subjective complaints is not entitled to any weight." *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 879 (3d Cir. 2005). Indeed, Plaintiff has not pointed to, nor have I found, any statements made by Plaintiff's treating physician which reflect a judgment[5] as to the nature and severity of the impairments, much less ones which contradict the ALJ's determinations.

On the other hand, to the extent that Plaintiff argues that the ALJ erred in not assigning weight to the V.A. determination that Plaintiff was 100% disabled, Plaintiff is correct. Although a determination by a different agency that a claimant is disabled is not binding on the Social Security Administration, 20 C.F.R. §§ 404.1504, 416.904, such determinations are nonetheless evidence of a disability, *id.* at § 404.1512(b)(1)(v), and "cannot be ignored," SSR 06-03p. Moreover, the Third Circuit has held that determinations of disability by other government agencies are "entitled to substantial weight" in the Social Security context. *Kane v. Heckler*, 776

---

[5] Black's Law Dictionary defines "judgment" as "[t]he mental faculty that causes one to do or say certain things at certain times, such as exercising one's own discretion or advising others; the mental faculty of decision-making." JUDGMENT, Black's Law Dictionary (10th ed. 2014). Similarly, Black's defines "opinion" as "2. A formal expression of judgment or advice based on an expert's special knowledge . . . . 3. A person's thought, belief, or inference . . . Also termed (in sense 3) *conclusion*." Thus, the listing of symptoms, for example, or the recitation of facts from a medical examination, is not a judgment or opinion, as that does not demonstrate the medical professional's decision-making or thoughts, beliefs, or inferences.

F.2d 1130, 1135 (3d Cir. 1985); *see also Fowler v. Califano*, 596 F.2d 600, 603 (3d Cir. 1979). Indeed, with regard to V.A. disability and Social Security disability, the Ninth Circuit has noted "the marked similarity between these two federal disability programs," and requires that the ALJ "ordinarily give great weight to a V.A. determination of disability." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (reversing and remanding ALJ decision due to failure to consider V.A. disability rating). Indeed, in that Circuit, an "ALJ may give less weight to a V.A. disability rating" only if she "gives persuasive, specific, valid reasons for doing so that are supported by the record." *Id.* Similarly, the Seventh Circuit has stated that the differences between V.A. disability determinations and Social Security determinations "are small," and, significantly, found that the VA's determination that a claimant was "totally unemployable by reason of his disability . . . equates to a finding of total disability under the regulations of the Social Security Administration." *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *see also Burrows v. Colvin*, Civ. No. 1:14 -00314-TFM, 2015 WL 4662463, at *7 (W.D. Pa. Aug. 6, 2015).

District courts in this Circuit have likewise found reversible error where "the ALJ rejected the V.A. determination solely on the differences between the standard for disability between the V.A. and the SSA, with no analysis of the facts," *Solomon v. Colvin*, Civ. No 12-1406-RGA-MPT, 2013 WL 5720302, at *16 (D. Del. Oct. 22, 2013), or where the court "cannot discern from the record that the ALJ placed substantial weight on the determination of the V.A. or appropriately considered it." *Sharpe v. Colvin*, No. 1:14-CV-00779, 2015 WL 574623, at *21 (M.D. Pa. Feb. 11, 2015). Although another court upheld an ALJ decision which discounted a V.A. disability determination, that court noted that the ALJ "considered the VA's disability

determination and cited reasons why she afforded it only 'some weight.'" *Reeves v. Colvin*, Civ. No. 3:15-444, 2015 WL 4601199, at *12 (M.D. Pa. July 30, 2015).

Here, the V.A. originally found that Plaintiff was 90% or partially disabled. However, Plaintiff was given a V.A. disability rating of 100%, i.e., totally disabled, shortly before the hearing before the ALJ. Moreover, at the hearing, Plaintiff's attorney reported the 100% disability rating and provided the ALJ with a copy of the decision by the V.A. A.R. 56–57. Nonetheless, despite having the more recent disability decision in the record before her at the time of her decision, *see* Ex. 13E, A.R. 221–22, the ALJ ignored or overlooked the 100% disability rating, stating that the V.A. only found Plaintiff to be "partially disabled." Finally, the ALJ, in discounting the V.A. determination, stated simply that the V.A. disability ratings were "not given significant weight as the standard for disability is different under the Social Security Act." A.R. 44.

Given the instructions from the Third Circuit and other courts that a 100% V.A. disability finding is entitled to "substantial weight," the ALJ's conclusory basis for dismissing the V.A.'s decision, without any analysis, was error. Moreover, I cannot find that this error was harmless. Although the V.A.'s conclusion that Plaintiff is 100% disabled is not binding on the ALJ, the V.A. disability rating determinations include specific findings regarding the meaning of the various ratings, which may impact the disability findings here. For example, the 50% rating given to Plaintiff for PTSD is assigned for "occupational and social impairments with reduced reliability and productivity." A.R. 1657. Similarly, a 10% rating for patellofemoral syndrome, which Plaintiff was assigned in the most recent decision, is only warranted where "extension is limited to 10 degrees," including "[f]unctional loss due to pain." A.R. 1665–66. Based on the limitations described by the V.A. rating system, it is possible that, if the ALJ had given the V.A.

determination the required weight, the outcome of Plaintiff's Social Security application could have been different.  I therefore find that the ALJ's failure to appropriately consider the 100% disability determination of the V.A. warrants remand for further consideration. *See Kane*, 776 F.2d at 1135 (remanding for consideration of V.A. disability determination).

Although the ALJ's failure to give weight to the V.A. disability determination is sufficient to remand, to help guide the ALJ's decision, I will also examine Plaintiff's additional arguments.

### b. State Examiners

First, Plaintiff briefly asserts that, while the ALJ gave "great weight" to the state physicians, Dr. Amy Brams and Dr. Marc Weber, their reports "make no mention that the medical records of the treating doctors were reviewed, nor did they refute the findings of the treating doctors." Pl. Br. at 8. However, Plaintiff cites no case law to suggest that this is an error. Indeed, it is not necessary for the report of a state examining physician to refute the findings of the treating doctors for an ALJ to rely on such a report; the ALJ may simply weigh the competing evidence. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011).

Next, Plaintiff asserts that the ALJ failed to mention whether she gave any weight to the Dr. Baharlias, the state consultative examiner. However, even if the ALJ's failure to discuss this report was error, it was harmless. Dr. Baharlias concluded that Plaintiff suffered from PTSD, depression, and anxiety, as well as "other medical problems," but also found that Plaintiff's "insight and judgment were satisfactory," and that Plaintiff did not have "any problem with concentration or cognitive abilities." A.R. 999–1000. The ALJ's decision, which found that Plaintiff does suffer from PTSD, but that his "cognitive function, memory, and concentration all

were adequate," is entirely congruent with Dr. Baharlias's evaluation. Thus, this issue does not merit further discussion.

### c. Evaluation of Dr. Paul Fulford

Plaintiff asserts that the report of Dr. Paul Fulford should be considered as medical evidence. Pl. Br. at 9. This Court may "order additional evidence to be taken before the Commissioner of Social Security," but may only do so "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

Defendant concedes that the report is "certainly new" and acknowledges that "Plaintiff arguably has good cause as to why it was not previously presented, in that it did not exist at the time." Def. Opp. at 9. However, Defendant argues that Dr. Fulford's report is not material, because it does not relate to the period at issue. Def. Opp. at 9. That is, Defendant asserts that the report deals only with "observations relating to Plaintiff's condition at the time of the report," while the period at issue is between the alleged onset date of disability, September 28, 2005, through the date of the Commissioner's final decision, January 24, 2011. *Id.* at 9–10.

In response, Plaintiff acknowledges that the report "did not directly state that [Dr. Fulford] evaluated records that pertained to the period at issue," but asserts that that Dr. Fulford "was given materials relating to the period at issue." Pl. Repl. at 5. Plaintiff then submitted an addendum from Dr. Fulford, who stated that the timing issue "is atypical, in my opinion, of the criteria that are used in testimony on Social Security Disability." Fulford Addendum at 1. Dr. Fulford indicated that "[a]ccording to the DSM-V, a diagnosis is made in the present." *Id.* Dr. Fulford also added that "[a] present evaluation is based on not just present information obtained in the interview, but also any background information that may be available." *Id.* at 1–2.

In order for new evidence to be considered, it must be material; "[a]n implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Szubak v. Sec'y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984); *see also* 20 C.F.R. § 404.970(b) (stating that, on review of ALJ decision by Appeals Council, the Appeals Council "shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision."). Here, as Defendant asserts, the time period at issue is the one for which benefits were denied, and closed on the date of the Commissioner's final decision. Dr. Fulford's report is an evaluation of Plaintiff's present psychological state—that is, his state on the date of the examination, which occurred over three years after the completion of the relevant period. While Dr. Fulford examined portions of the record, he makes no finding as to Plaintiff's psychological or physical state during the time period at issue. Indeed, Dr. Fulford, in his addendum, stated that his evaluation and diagnosis were "made in the present." Fulford Addendum at 1. This evaluation might be useful if Plaintiff wishes to file a new claim for Social Security Disability Benefits, concerning his current disabled status. However, the report is not material to the determination which is presently before the Court.[6]

### d. Plaintiff's Pain and Subjective Complaints

Finally, Plaintiff asserts that the ALJ failed to adequately explain her credibility analysis with respect to Plaintiff's complaints of pain and other subjective complaints. Plaintiff argues that "[t]here is an overwhelming amount of objective evidence substantiating Claimant's

---

[6] Defendant also disputes whether Dr. Fulford may be considered an expert in Social Security law and regulations, Def. Opp. at 10. However, because the report is not material to the appeal, I need not address this issue.

physical complaints" and that his "mental impairments are also substantiated by the record." Pl. Br. at 12. Defendant, on the other hand, asserts that the ALJ "noted numerous inconsistencies between the objective medical evidence and Plaintiff's subjective complaints." Def. Br. at 11.

In evaluating symptoms, the ALJ must consider "all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence."). However, after the ALJ finds a medical impairment which could cause the symptoms, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." *Hartranft*, 181 F.3d at 361. Thus, the ALJ must "determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Id.*

With respect to Plaintiff's physical complaints, I agree that the ALJ failed to properly account for all of the objective evidence in assessing Plaintiff's subjective complaints. For example, with regard to Plaintiff's knee pain, the ALJ stated that "medical imaging of the knees, taken in July 20, 2008, was unremarkable and within normal limits," and she specifically noted that "no knee effusion was present." A.R. 42. However, imaging conducted in April 2010 did show small suprapatella joint effusion, and small osteophytes in the knees. A.R. 1961–1962. Similarly, when discussing Plaintiff's back pain, the ALJ found that "medical imaging of the lumbar spine, taken July 20, 2008, was unremarkable and within normal limits." A.R. 42. Again, the ALJ appears to have not considered a more recent MRI, taken on August 6, 2009, which showed "right paracentral protrusion at L5/S1" and well as "mild to moderate facet and ligamentum flavum hyptertrophy." A.R. 1967. I also note that, despite finding that Plaintiff's

penile thrombosis, sleep apnea, and headaches were severe impairments, the ALJ did not discuss the effect of these impairments on Plaintiff's ability to work. A.R. 38, 42–43.  On remand, the ALJ should consider the effect of all of Plaintiff's impairments, as well as the more recent medical imagings that were available for her at the time of the prior decision.

With regard to Plaintiff's mental impairment, I find that the evidence in the record substantiates the ALJ's determination. While the medical records indicate that Plaintiff suffered from PTSD, and Plaintiff's mental symptoms are therefore corroborated, there is nothing in the record to suggest that Plaintiff's mental state prevented him from working. Indeed, the records show that Plaintiff's ""[t]hought process appeared logical and coherent." A.R. 821. Similarly, Dr. Brams, the state consultative examiner, found that Plaintiff was able to "to follow simple instructions, attend and concentrate, keep adequate pace and persist, relate and adapt to routine tasks in a work situation." A.R. 1635. Accordingly, the ALJ did not err in this regard.

### e. Impairments in Combination

Finally, Plaintiff asserts that the ALJ "overlooked Claimant's mental impairments and did not look at the bigger picture as required under the Act." Pl. Br. at 13. Specifically, Plaintiff argues that the ALJ did not consider his physical problems "as a whole," and did not consider the side effects of the medication Plaintiff takes. *Id.* Defendant responds, first, by asserting that Plaintiff has not identified any particular error in the RFC determination, or any particular functional limitation that the ALJ failed to consider. Def. Opp. at 13. Next, Defendant argues that the ALJ explicitly stated that Plaintiff did not have "an impairment or combination of impairments" that met or medically equaled a listed impairment; moreover, Defendant points out that the ALJ's RFC determination "explicitly includes mental, exertional, postural, and

environmental restrictions." *Id.* at 13–14. Thus, Defendant asserts that "[n]othing in the record indicates . . . that the ALJ did not consider his impairments in combination." *Id.* at 14.

The Social Security regulations require that "[i]n determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law," an ALJ must "consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523. Indeed, where the ALJ determines that an impairment is severe, but fails to discuss the impact of that impairment in combination with other impairments, it is necessary to vacate and remand. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505 (3d Cir. 2009) (stating that "the ALJ, having recognized obesity as an impairment, should determine in the first instance whether, and to what extent, Diaz's obesity, in combination with her asthma, diabetes, arthritis, back pain, and hypertension, impacted her workplace performance.").

Here, the ALJ's RFC determination did not account for any limitations imposed by Plaintiff's headaches and recurring penile thrombosis, despite having determined that such impairments were severe. Moreover, while the ALJ found that the medical evidence did not support the full extent of Plaintiff's complaints of pain, she should nonetheless have considered the combined effect of pain in Plaintiff's knees, back, and elbow on his ability to work. While Defendant asserts that the record does not show that the ALJ did not consider the combined effect of these impairments, without an explanation of such consideration in the decision, I cannot review her determination. This inadequacy in the decision requires remand for an explanation of the effect of all of Plaintiff's severe impairments in combination on his ability to work.

Thus, I find that the ALJ erred in failing to give substantial weight to the decision of the Veterans Administration that Plaintiff has a 100% disability rating, and further failed to consider the combined effect of Plaintiff's severe impairment in the RFC determination. Accordingly, the ALJ's decision is not supported by substantial evidence, and must be vacated and remanded.

**Conclusion**

For the reasons expressed herein, the decision of the Commissioner is vacated and remanded for further proceedings consistent with this opinion. An appropriate Order shall follow.

Date: September 1, 2015

  /s/ Freda L. Wolfson_____
Hon. Freda L. Wolfson
United States District Judge